Richita Marie Hackford *pro se*
820 E 300 N 113-10
Roosevelt, Utah 84066
Cell #435-724-1236

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH

FILED IN UNITED STATES DISTRICT COURT, DISTRICT OF UTAH
SEP 23 2024
GARY P. SERDAR
CLERK OF COURT
BY _____ DEPUTY CLERK

| | |
|---|---|
| RICHITA MARIE HACKFORD,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR, INSPECTOR GENERAL, MARK LEE GREENBLAT, SECRETARY OF THE INTERIOR DEB HAALAND, BUREAU OF INDIAN AFFAIRS, DARRYL LACOUNTE, and THE BUREAU OF LAND MANAGEMENT, TRACY STONE MANNING,<br><br>Defendant's. | WRONGFUL TERMINATION DEPRIVATIONS AND INJURIES SUFFERED AS A DIRECT RESULT OF<br><br>P.L. 671 UTE PARTITION ACT APRIL 5, 1956 and the<br><br>TERMINATION PROCLAMATION, 26 Fed. Reg. 8042 (August 26, 1961), AR 1432. *Accord* 25 U.S.C. 677v.<br><br>Case: 2:24-cv-00700<br>Assigned To : Oberg, Daphne A.<br>Assign. Date : 9/23/2024<br>Description: Hackford v. United States Department of the Interior et al |

Plaintiff is required to "state a claim upon which relief can be granted, Rule 8 (a) (2) requires that a complaint contain 'a short and plain statement of the claim showing that the pleader is entitled to relief', with simplicity, conciseness and clarify."

## I. Statement of Plaintiff's claim for relief.

Plaintiff, a Shoshone Utah Indian by right of birth as per the U.S. Senate Act May 5, 1864 (13 Stat. 63) residing my entire life within the 1861 Uinta River Valley (*Reserve*) Reservation '*expressly set apart for the permanent settlement and exclusive occupation of Indians of Utah Territory as may be induced to inhabit the same*'. Brings this action against the United States

Department of the Interior Inspector General, the Secretary of the Interior, the Bureau of Indian Affairs and the Bureau of Land Management for deprivations and injuries suffered as a direct result of Plaintiff's 'wrongful termination' under P.L. 671 Ute Partition Act of April 5, 1956 and the Termination Proclamation, 26 Fed. Reg. 8042 (August 26, 1961), AR 1432. *Accord* 25 U.S.C. 677v., 'relief' can be granted the Plaintiff a Shoshone Utah Indian having absolutely no 'Ute Blood Quantum one half or otherwise' within my family lineage, thus, Plaintiff's 'wrongful termination' under the two Ute acts underlined above. Plaintiff is seeking restitution and damages for her wrongful termination under said 'Ute Acts' underlined above.

  Plaintiff is entitled to full compensation from the United States Department of the Interior Inspector General, the Secretary of the Interior, the Bureau of Indian Affairs, and the Bureau of Land Management for 73 years of long term suffering for wrongful harm having been enforced and inflicted upon the Plaintiff and for any and all material damages caused to the Plaintiff without an express 'act' of congress to so do, as congress cannot change my 'race' under the U.S. Senate Act May 5, 1864 (13 Stat. 63) from a Shoshone Utah Indian to that of an unlawfully alleged "mixed-blood Uintah 'Yampah' Ute". The Plaintiff's inherent legal rights, did not come from, nor are they in anywise derived from the relocated 1880 Colorado Confederate state Ute citizens, fraudulently alleged IRA – Ute Indian Tribe, Uintah and Ouray Ute Reservation as falsely alleged on the "Final Mixed-Blood Uintah 'Yamphah Ute' Roll" as fraudulently listed on the 'Federal Register", under the underlined 'Ute Acts' above, which did unlawfully place the Plaintiff under the State of Utah's fraudulent and unlawful assumptive state, county and city jurisdiction under a false allegation that Plaintiff is no longer recognized as a Shoshone Utah Indian residing within the 1861 Executive Order Uinta River Valley (*Reserve*) Reservation.

2

ARGUMENTS

**II. <u>U.S. Department of the Interior Inspector General, the Secretary of the Interior, the Bureau of Indian Affairs, and the U.S. Bureau of Land Management</u>** have and continue to violate the 'sovereign immunity rights' of the Plaintiff a Shoshone Utah Indian, Uinta River Valley (*Reserve*) Reservation, Uinta Agency without an express authorization from the Congress of the United States to so do under a falsified pre-text of the IRA – Ute Indian Tribe, Uintah and Ouray Reservation as follows:

   A.  <u>June 15, 1880 (21 Stat. 199) Treaty Agreement with the United States Government</u> [An act to accept and ratify the agreement submitted by the confederated bands of Ute Indians in Colorado, for the sale of their reservation in said State, and for other purposes, and to make the necessary appropriations for carrying out the same.]

      1.  <u>The Southern Utes agree</u> to remove to and settle upon the unoccupied lands on the <u>La Plata River, in Colorado</u>; and if there should not be sufficiency of such lands on the La Plate River in the vicinity in Colorado, the upon such other unoccupied agricultural lands as may be found on the La Plata River <u>or in the vicinity of New Mexico</u>.

      2.  <u>The Uncompahgre Utes</u> agree to remove to and settle upon agricultural lands on <u>Grand River, near the mouth of the Gunnison River, in Colorado</u>. If a sufficient quantity of agricultural land shall be found there, if not then upon such other unoccupied agricultural lands as may be found in the vicinity <u>and in the Territory of Utah</u>.

         (a.)  The 1861 Executive Order Uinta River Valley (*Reserve*) Reservation was set aside for the permanent settlement and occupation by the U.S. Senate Act May 5, 1864 (13 Stat. 63) for the Shoshone Nation Indians of Utah Territory 21 years before the Colorado state Ute citizens where unlawfully removed and placed on the 1861 Shoshone Uinta River Valley

3

(*Reserve*) Reservation, Utah Territory, as both Colorado and Utah Territories where by law legally separated nine months before the 1880 Confederated Ute treaty agreement with the United States said Ute treaties where made in Colorado, these are Colorado Ute treaties.

(b.)      LEASING OF CERTAIN LANDS IN THE UNCOMPAHGRE RESERVATION

**JUNE 13, 1808.** – Committed to the Committee of the Whole House on the state of the Union and ordered to be printed.
Mr. Lacey, from the Committee on Public Lands, submitted the following

REPORT.

[To accompany S. 4317.]

[ The Committee on the Public Lands, to whom was referred Senate bill 4317, having had the same under consideration report the same back with amendment.

Your committee are of the opinion that the <u>gilsonite, elaterite, and asphaitum in the Uncompahgre Reservation should not be longer withheld from use, but that some suitable arrangement should be made for opening and working the same.</u>

The question is one upon which there has been previous marked disagreement between the Senate and the House.

The House has expressed its views on several occasions after full discussion by adopting amendments to appropriation bills providing for the <u>leasing and operation of deposits of these mineral upon a royalty to the Government. On the other hand, the Senate has insisted upon opening and practically donating these minerals by entry under the general mineral land laws of the United States.</u>

The Senate bill 4317 is substantially in the line of the amendments made in the Senate and heretofore rejected by the House.

Your committee report back the Senate bill with the recommendation that it be amended by striking out all after the enacting clause and inserting the following as an amendment:

The Secretary of the Interior is hereby authorized to lease the reserved lands containing asphaitum, gilsonite, elaterite, and kindred substances in the Uncompahgre Reservation in Utah; said leases to be upon such royalty as the said Secretary may determine; to be reasonable, and said leases to be for such periods, not exceeding ten years, as he may determine; and regulations and limitations shall be provided by the Secretary as to the amount of lands embraced in each lease, or as to assignments of said leases, so as to prevent any monopoly of said minerals' and the Secretary will make all such rules and regulations as may be necessary for the purpose of carrying out the objects of this act:]

(c.)      *Uncompahgre Reserve*

[In Uintah and Ouray Agency: occupied by Tabequache Ute; acts of <u>June 15, 1880 (21 Stat., 199) and June 7, 1897 (80 Stat, 62)</u>.]

Executive Mansion, *January 5, 1882.*

It is hereby ordered that the following tract of country, in the Territory of Utah, be, and the same is hereby, withheld from sale and set apart as a reservation for the Uncompahgre Utes, VIZ: Beginning at the southeast corner of township 6 south, range 25 east, Salt Lake meridian; thence west to the southwest corner of township 6 south, range 24 east; thence north along the range line to the northwest corner of said township 6 south, range 24 east; thence west along the first standard parallel south of the Salt Lake base-line to a point where said standard parallel will, when extended, intersect the eastern boundary of the Uintah Indian Reservation as established by C.L. Du Bois, United States deputy surveyor, under his contract dated August 30, 1875; thence

4

along said boundary southeasterly to the Green River; southern boundary of said Uintah Reservation, as surveyed by Du Bois, intersects said river; thence northwesterly with the southern boundary of said reservation to the point where the line between ranges 16 and 17 east of Sale Lake meridian will, when surveyed, intersect east, Salt Lake meridian, to the third standard parallel south; thence east along said third standard parallel to the eastern boundary of Utah Territory; thence north along said boundary to a point due east of the place of beginning; thence due west to the place of beginning.

Chester A. Arthur.

(d.) The alleged 1882 Colorado 'Tabequache' Ute for Uncompahgre state Ute citizens alleged 'Uncompahgre Reservation' was never by law legally established under an un-ratified executive order therefore there is no legally alleged "Ouray Agency", nor could it be opened to allotments for said Uncompahgre state Ute citizens by an alleged 1897 federal law or opened up for leasing by the Secretary of the Interior in 1808 within the pre-existing, 1861 Shoshone Uinta River Valley (*Reserve*) Reservation when said 'land is held in trust status' by the United States Government under the U.S. Senate Act May 5, 1864 (13 Stat. 63) for the Shoshone Nation Indians of Utah Territory.

3. The White River Utes agree to remove to and settle upon agricultural lands on the Uinta(h) Reservation in Utah.

(a.) The White River Utes also included the Uintah Yampah Utes a band of White River Utes, neither having absolutely no legal claims within the 1861 Shoshone Utah Indians Uinta River Valley (*Reserve*) Reservation, Utah Territory as the 'land is held in trust status' by the United States Government under the U.S. Senate Act May 5, 1864 (13 Stat. 63) for the Shoshone Nation Indians of Utah Territory.

(b.) Confederate Utes 1880 agreement with the United States, SEC. 4, places every one of the Confederated Utes under the law both civil and criminal of the state or territory where they reside, as ordinary state citizens of the United States Government regardless of which state or territory they may reside within the continental United States.

    (1.) Thus, it would require an 'express act of congress' to have authorized The three bands of Colorado State Ute citizens White River- Uintah Yampah a band of White River Utes and the Uncompahgre Colorado state Ute citizens 'removal' to justify the <u>usage of the United States Calvary from the State or Territory of Colorado onto the pre-existing 1861 Shoshone Uinta River Valley (*Reserve*) Reservation.</u>

    (a.) Action having been taken by the U.S. Calvary without such an act of congress, did violate the inherent rights of the U.S. Senate Act May 5, 1864 (13 Stat. 63) Shoshone Nation Indians of Utah Territory placing them in extreme jeopardy, thus jeopardizing the legal, lawful inherent rights of the Plaintiff.

  4. <u>May 11, 1927, Department of the Interior, United States Indian Field Service, Uintah and Ouray Agency, Fort Duchesne, Utah</u>, letter submitted by H.M. Tidwell, Superintendent of the "Uinta Agency" sent to Charles Bruke, Commissioner of Indian Affairs, Washington, D.C., a fraudulent deception was created by Superintendent Tidwell, as there is no alleged "Ouray Uncompahgre 1880 Colorado state Ute citizens" alleged federal Ouray 1880 state Uncompahgre Ute citizens' alleged Ute agency under the unratified Ouray, Uncompahgre Ute Reservation.

    (a.) Quoting the first paragraph of Superintendent Tidwell's letter, [I am enclosing herewith the original and one copy of the resolution passed by the headmen of the three bands of this reservation on May 7th, 1927, making request to your Office for the establishment and organization of a business committee for this reservation as well as designating the persons to fill said positions and would recommend that your Office approve the action of the headmen and also the organization of this business committee.]

    (1.) The headmen of the three 1880 Colorado state Ute citizens consisting of two each from the unlawfully relocated Whiteriver, Uintah 'Yampah' a band of Whiterivers and the Uncompahgre state Ute citizens that have absolutely no alleged 'Uintah and Ouray Ute Indian Reservation within the 1861 Shoshone Nation's Indians of Utah Territory Uinta River

6

Valley Reservation a fraudulent deception which continues today, an unlawful misusage of these three groups of 1880 Colorado Confederate state Ute citizens by the defendants.

*See exhibit 1., 9 pgs.*

(2.) The Uinta Agency Superintendent Tidwell, and Charles Bruke Commissioner of Indian Affairs who 'approved' this fraudulent 'Resolution', violated the U.S. Senate Act May 5, 1864 (13 Stat. 63) Shoshone Nation's Indians of Utah Territory Sovereignty from this point onward this unlawful 'resolution' killed the voices, voting power and jurisdictional authority of the 'Sovereign Shoshone Nation' within the 1861 Shoshone Uinta River Valley (*Reserve*) Reservation underneath a fraudulent allegation of an unlawfully alleged "Uintah and Ouray Ute Indian Reservation" in Utah which unlawfully established the prelude, for the introduction of what unlawfully followed.

5. June 18, 1934, The Indian Reorganization Act (Wheeler-Howard Act – 48 Stat. 984 – 25 U.S.C. § 461 *et seq*)

1. Sec. 19 [The term "Indian" as used in this Act shall include all persons of Indian descent who are members of any recognized Indian tribe now under Federal jurisdiction, and all person who are descendants of such members who were, on June 1, 1934, residing within the present boundaries of any reservation, and shall further include all other persons with one-half or more Indian blood. For the purposes of this Act, Eskimos and other aboriginal peoples of Alaska shall be considered Indian. The term "tribe" wherever used in this Act shall be construed to refer to any Indian tribe, organized band, pueblo, or the Indians residing on one reservation. The words 'adult Indians' wherever used in this Act shall be construed to refer to Indians who have attained the age of twenty-one years.]

(a.) Shoshone 1861 Uinta River Valley (*Reserve*) Reservation, Uinta Agency, Superintendent Tidwell's Colorado 1880 state Ute citizens 'Resolution' that unlawfully formed and organized a state Ute citizens business committee of six, two from each of the three Colorado State Whiteriver, Uintah 'Yampah' a band of Whiterivers' and Uncompahgre state Ute citizens' could not and did not legally make these "Utes" collectively "federally recognized Indians" under Federal jurisdiction, underneath Tidwell and the Commissioner of Indian Affairs

Charles Brukes 'approved Ute Resolution.' They remain today unlawfully relocated 1880 Colorado State Ute Citizens' having absolutely no legal claims as state citizens while unlawfully continuing to reside within the Shoshone Nation's 1861 Uinta River Valley (*Reserve*) Reservation in violation of the U.S. Senate Act May 5, 1864 (13 Stat. 63).

6. <u>Ten Years of Tribal Government Under the I.R.A., United States Indian Service</u>
   1947

Table A.   Indian Tribes, Bands and Communities Which Voted to Accept or Reject the Terms of the Indian Reorganization Act, the Dates When Elections Were Held, and the Votes Cast

UTAH

Uintah & Ouray Agency:

Uintah………Population………….. 1,251
　　　　　Voting population…….634
　　　　　Total Yes…………….335
　　　　　Votes No……………...21
　　　　　Election Dates………………December 15, 1934

Table B.   Indian Tribes, Bands and Communities under Constitutions and Charters as Approved by the Secretary of the Interior In accordance with the Indian Reorganization Act, Oklahoma Indian Welfare Act, Alaska Reorganization Act

Agency and Reservation………………Uintah & Ouray
Official Name of Organization……..Ute Indian Tribe Uintah & Ouray Reservation
Constitution Approved……………..January 19, 1937
Charter Ratified…………………….August 10, 1938
Population…………………………..1,347

*See exhibit 2., 4 pgs.*

(b.)　　REPORT CONCERNING INDIANS IN UTAH
REPORT OF AGENT FOR UINTA AND OURAY AGENCY

UINTA AND OURAY AGENCY,
*Whiterocks, Utah, July 30, 1902.*

Sir: I have the honor herewith to submit my fourth annual report of the affairs of this agency.

Location. – Our nearest railroad station is Price, Utah, which is 110 miles from the Uinta Agency, where the agent resides and has his office. The Ouray Agency is 35 miles and the Ouray school is 20 miles southwest of the Uinta Agency. The Uinta school is near the Uinta Agency. The road to the railroad is very bad, but the roads on the reservation are fairly good.

The census taken June 30, 1902, shows the following number of Indians:

8

Uinta Ute, Uinta Agency:
- Males over 18 years............................................................... 163
- Females over 18 years............................................................ 122
- Males 6 to 18 years................................................................. 53
- Females 6 to 18 years.............................................................. 43
- Males under 6 years................................................................ 38
- Females under 6 years............................................................. 47
- Combined Total...... 467
- Eligible to Vote.......285

White River Ute, Uinta Agency:
- Males over 18 years............................................................... 109
- Females over 18 years............................................................. 91
- Males 6 to 18 years................................................................. 47
- Females 6 to 18 years.............................................................. 51
- Males under 6 years................................................................ 25
- Females under 6 years............................................................. 25
- Combined Total...... 349
- Not Eligible to Vote State Ute Citizens....... 200

Uncompahgre Ute, Ouray Agency:
- Males over 18 years............................................................... 287
- Females over 18 years............................................................ 264
- Males 6 to 18 years................................................................. 87
- Females 6 to 18 years.............................................................. 94
- Males under 6 years................................................................ 32
- Females under 6 years............................................................. 31
- Combined Total.....795
- Not Eligible to Vote State Ute Citizens..... 551

White River Ute, Ouray Agency:
- Males over 18 years............................................................... 7
- Females over 18 years............................................................. 5
- Males 6 to 18 years................................................................. 2
- Females 6 to 18 years.............................................................. 3
- Combined Total......17
- Not Eligible to Vote State Ute Citizens...... 12

*See exhibit 3., 2 pgs.*

Total Uinta (Shoshone) Eligible to Voter.......................285

**1880 Colorado State Ute Citizens unlawfully residing on the 1861 Shoshone Uinta River Valley Reservation: Total 1,160**

Total White Rivers Not Eligible to Vote............ 212

Total Uncompahgre Not Eligible to Vote............ 551     **Uinta Shoshone... Total 467**

Grand total Ute Not Eligible to Vote.................763     **Eligible to Vote... Total 285**

(c.) These 1880 Confederate Colorado State Ute Citizens' unlawfully residing within the Shoshone Nation Utah Indians <u>1861 Uinta River Valley (*Reserve*) Reservation</u> have always out- numbered the Shoshone Utah Indians and is 'why' they were to be kept 'separated – kept apart' from the Shoshone who have 'lawful ownership' under the Senate Act May 5, 1864 (13 Stat. 63) said 'reservation lands' underlined above, remain held in trust status by the United States Government 'in tacked as originally set aside' these lands have never been 'diminished', the defendants predecessors obviously failed to do their jobs, as have the current defendants', thus evidence of the continual abusive violations of the Shoshone Nation of Utah Indians, who fall under an express act of the U.S. Senate.

Following is exactly why Uinta Agency, Superintendent Tidwell and the Charles Burke Commissioner of Indian Affairs 'pushed and approved' the unlawful 1880 Colorado State Ute Citizens "Resolution" to form a "state Ute citizens business committee" <u>they needed the voting power of these Utes for what they had pre-planned that would follow next</u>.

(7.)     Bill to Divide Ute Indian Assets Passes Senate Indian Subcommittee

Legislation authorizing the division of tribal assets between the mixed-blood and full-blood Utes of Utah's Uintah and Ouray Reservation was approved Monday by the Senate subcommittee on Indian Affairs and Tuesday by the Senate interior and Insular affairs committee. Ute Indians went to Washington last week to describe their plan to partition their tribe between mixed and full-bloods and to initiate a program leading to eventual full citizenship for all 1800 Uintah Basin Utes. No objections to the program were voiced when the hearing was held on the bill in Washington last week. Attending the hearings from Utah were:
Russell Cuch, and Conner Chapoose, full-blooded Ute delegates **1880 Colorado State Ute Citizens**
Albert Harries, delegate for the mixed bloods **Paiute and a Utah Mormon**
John S. Boyden, Salt Lake City Attorney **Mormon attorney representing both full-blood and mixed blood groups**
R.O. Curry, Ute Tribal business manager **1880 Colorado State Ute Citizen**
Ralph Gelvin, Phoenix, Arizona, area Indian director **violated Shoshone Nation Senate Act May 5, 1864 (13 Stat. 63)**
<u>Harry Gilmore, superintendent Uintah-Ouray Reservation</u> **violated Shoshone Nation Senate Act May 5, 1864 (13 Stat,. 63)**
Seated: Rep. E.Y. Berry, chairman of the House Indian Affairs Committee **violated Shoshone Nation Senate Act May 5, 1864 (13 Stat. 63)**
Glenn L. Emmons, commissioner of Indian Affairs **violated Shoshone Nation Senate Act May 5, 1864 (13 Stat. 63)**
Senator Arthur V. Watkins, chairman of the Senate Indian Affairs Committee
& hearing chairman **Mormon violated Shoshone Nation Senate Act May 5, 1864 (13 Stat. 64)**

Under the program the 'assets' of the tribe would be divided equally between the **1,769** members, of which **439** <u>are of mixed blood or less than 50 percent Indian</u>. Early in the program there would be two councils but gradually the council for the mixed-blood group would disappear as the members are absorbed by the white community. *Courties Tribune*

*See exhibit 4., 3 pgs.*

(a.) They are purporting there are **1,330 – 1880 Colorado Confederate Utes'** fraudulently claiming an unlawful interest in the 'assets' of the Shoshone 1861 Uinta River Valley (*Reserve*) Reservation, 'assets' belonging to the Shoshone Nation Indians of Utah, Senate Act May 5, 1864 (13 Stat. 63).

## III. Foundation that establishes the 1861 Shoshone Uinta River Valley (*Reserve*) Reservation

A. 1848 Treaty of Guadalupe Hidalgo, with the United States, Article XI – Quote from the federal Utah Superintendency [A sale of the Spanish Fork reservation is recommended, if the Commissioner decides upon the occupation of the Uintah reservation, and also the removal of the agency to that point. I feel it to be my duty to again recommend that treaties be entered into with all of these tribes to extinguish their right of occupancy. Justice and the peace of the country require it, and it seems to be absolutely necessary in order to bring them under the control of the government, and to give proper effect to the laws of the Territory, and to those regulating Indian trade and intercourse. <u>Although the title was obtained by the treaty with Mexico, these Indians were then the occupants of every portion of this Territory, enjoying the same rights and privileges as the Indians east of the Mississippi river.</u> **The United States accepted of the cession, subject to all the just rights of this third party then in the actual possession, but who was not a party to the treaty**.]

James Duane Doty, Superintendent.

*See exhibit 5., 2 pgs.*

(a.) 1848 Treaty of Guadalupe Hidalgo, Article XI 'third party rights' Shoshone Nation Indians of Utah Territory have never relinquished or otherwise lost this right Article XI granted said Shoshone Nation an enforceable individual right privately granted to the Shoshone Utah Indians, thus the Plaintiff has a private right of action as a Shoshone Utah Indian, residing within the Shoshone Uinta River Valley (*Reserve*) Reservation.

(b.) 1865 Un-ratified Spanish Fork Treaty, two quotes Utah Superintendency

11

1st [and advised me not to be discouraged by the other officers of the government, who declared, that rather than associate with Brigham Young on such and occasion, they would have the negotiation fail; that they would rather the Indians, than the Mormons, would have the land.]

2nd [I met the Indians, according to appointment, on the 6th of June, and on the 7th submitted the draft of a treaty which was signed on the 8th. The following is a synopsis of its provisions:

Sec. 1. The Indians relinquish their right of possession to all of the lands within Utah Territory occupied by them.

Sec. 2. With the exception of the Uintah valley, which is to be reserved for their exclusive occupation, the President may place upon said reservation other bands of friendly Indians of Utah Territory.

Sec. 3. The said tribes agree to remove upon said reservation within one year after ratification of the treaty. Meanwhile they will be allowed to reside upon any unoccupied lands.

Sec. 4. The Indians to be allowed to take fish at their accustomed places; also to gather roots and berries on unclaimed lands.

Sec. 5. In consideration thereof the United States agree –

First. To protect the said Indians and their said reservation during good behavior.]     *see exhibit 6., 2 pgs.*

(a.) Treaty was never ratified, so the Shoshone Utah Indian Plaintiff has never lost my individual right to be anywhere on the Spanish Fork lands or any land designated as Utah Territory, the "Ancestral Homelands" of the Shoshone Nation Indians of Utah Territory <u>the United States took possession of said lands without a formal treaty or purchase of the 'third party inherent rights' of the Shoshone Nation Indians of Utah Territory</u>, thus the Plaintiff's 'legal inherent rights' remain, 'in tack' and the fraud under the IRA – Ute Indian tribe of the fraudulently alleged Uintah and Ouray 'Ute' Reservation or the fraud of the Ute Partition and Termination acts, doesn't dissolve, abrogate or otherwise relinquish or divest Plaintiff's claims under the U.S. Senate Act May 5, 1864 (13 Stat. 63) to lands designated as Utah Territory.

4. <u>Superintendency of Indian Affairs, Great Salt Lake City, U.T., January 25, 1865</u>

Quote last paragraph [Therefore, notice is hereby given under instructions of the Department of the Interior transmitted to me through the Commissioner of Indian Affairs, "That all white settlers must forthwith remove from the Uinta(h) Reservation," and that on the opening of spring "all persons found therein unlawfully," "that is, without a license in trade, a passport, or permission of the proper authorities, will be removed," and that the laws of the United States, applicable to Indian Reservations, will be enforced. O.H. IRISH, Supt. Ind. Affairs.]     *See exhibit 7.*

(a.) The defendants' have failed from the unset to enforce this 'order' under the territorial government and this is the final end result of actions having been fraudulent taken under II. The current defendants' are liable for the past actions of their degenerative predecessors' actions. United States Department of the Interior, Office of the Solicitor, Washington, D.C. 20248

"Memorandum" March 12, 2014, M-37029 Quoting from page 16. [The Executive Branch has also regularly exercised such authority over tribes. The War Department initially had the responsibility for Indian affairs. In 1832, Congress established the Commissioner of Indian Affairs, who was responsible, at the direction of the Secretary of War, for the "direction and management of all Indian affairs, and of all matters arising out of Indian relations...." [103] The Office of Indian Affairs ("Office") was thus charged with implementing and executing treaties and other legislation related to tribes and Indians. The Office was transferred to the Department of the Interior in 1849. [104] With the allotment and assimilation eras, and at the time the IRA was passed, the Office of Indian Affairs and the agents and superintendents of the Indian reservations exercised virtually unfettered supervision over tribes and Indians [105] The Office of Indian Affairs became responsible, for example, for the administration of Indian reservations, in addition to implementing legislation. [106] The Office exercised this administrative jurisdiction over tribes, individual Indians, and their land. As part of the exercise of this administrative jurisdiction, the Office produced annual reports, surveys, and census reports on many of the tribes and Indians under its jurisdiction.
This summary of the exercise of authority and oversight by the United States through treaty, legislation, the Executive Branch and the Office of Indian Affairs is intended to serve as a non-exclusive representation of the great breadth of actions and jurisdiction that the United States has held, and at times, asserted over Indians over the course of its history.]

(b.) Please pay special attention to the footnote under [102] terminated tribes, if indeed the fraudulently alleged "partial termination" was done by an explicit act of congress, why is it not listed an contained herein under this footnote, and the Plaintiff cannot be restored into a falsified IRA – Ute Indian tribe, when Plaintiffs legal inherent rights are not derived from the fraudulent Ute Indian tribe but from the Senate Act May 5, 1864 (13 Stat. 63) Shoshone Nation Indians of Utah Territory. Footnote [105] [Meriam Report at 140-54 (recommending decentralization of control); *id.* at 140-41,

"[W]hat strikes the careful observer in visiting Indian jurisdictions is not in their uniformity, but in their diversity....Because of this diversity, it seems imperative to recommend that a distinctive program and policy be adopted for each jurisdiction, especially fitted to its needs."]

Plaintiffs complaint is a prime example of how a careful observer should be able to recognize the defendants' distinctive program and policies adopted fraudulently took away the jurisdictional

authority of the Shoshone Nation Indians of Utah Territory, Uinta River Valley (*Reserve*) Reservation and unlawfully replaced it with the IRA – fraudulent Ute Indian tribe of three Colorado State Confederate Whiteriver, Uintah Yampah a band of Whiterivers and the Uncompahgre State Ute citizens. Now, refer to bottom of page 10 and top of page 11, Quote [The Chairman. That is just what I was coming to. As a matter of fact, you have got one-fourth in there. I think it should have more than one-fourth. I think it should be one-half. In other words, I do not think the Government of the United States should go out here and take a lot of Indians in that are quarter bloods and take them in under the provisions of this act. If they are Indians of the half-blood then the Government should perhaps take them in, but not unless they are. If you pass it to where they are quarter-blood Indians you are going to have all kinds of people coming in and claiming they are quarter-blood Indians and want to be put upon the Government rolls, and in my judgment it should not be done. **What we are trying to do is get rid of the Indian problem rather than to add to it**.]     *See exhibit 8., 3 pgs.*

This is a very pertinent issue, as this unconstitutional IRA – "Indian Blood Quantum" was unlawfully used against the Plaintiff who has absolutely NO 1880 Colorado Confederate State Citizens 'Ute Blood' as fraudulently alleged in her partial termination as fraudulently listed on the Federal Register's Final Mixed-blood Ute Roll, as an alleged mixed-blood 'Uintah' implying Plaintiff is a Uintah Yampah State Ute citizen, a band of Whiteriver Utes, when indeed Plaintiff is a Shoshone Utah Indian by an Act of the Senate May 5, 1864 (13 Stat. 63).

Whereby the defendant's did so without congressional approval, as even the Congress of the United States doesn't have the constitutional power or authority to change anyone's 'race', especially the Plaintiff's which has caused immense harm and long term suffering upon the Plaintiff herein, by unlawfully throwing Plaintiff under Utah State, county and city assumptive jurisdiction. Whereby the defendants are liable for all harm caused to the Plaintiff under an unlawfully alleged 'state jurisdiction' alleged over the Plaintiff as a direct result of the defendants unconstitutional actions taken against the Plaintiff.

Listing of Plaintiff's 'RELEIF BEING SOUGHT'

1. For the unlawful change of the Plaintiff's "race" by the defendants herein the Plaintiff is seeking relief in the amount of five-million dollars or the highest allowable under federal law be granted to the Plaintiff for defendants' usage of an unconstitutional IRA "Blood-Quantum" used as an act of genocide in an attempt to eliminate the Shoshone Utah Indian Plaintiff by unlawfully changing my "race", to unlawfully gain control of the Shoshone Utah Indians' Uinta River Valley (*Reserve*) Reservation 'assets and revenue'.

2. For the harm caused Plaintiff under a false enforcement under Utah State Law, as alleged State, county and city state jurisdictions Plaintiff is seeking the return of three homes whereby the defendants' issue in the name of the Plaintiff a 'clear title' to all three homes unlawfully taken from Plaintiff under state court evictions listed below:

    (a.) Home located at 820 E 300 N Roosevelt, Uinta River Valley (*Reserve*) Reservation
    (b.) Home located at 11675 North 3650 West, Neola, Uinta River Valley (*Reserve*) Reservation
    (c.) Home located at 3800 N 11720 W, Neola, Uinta River Valley (*Reserve*) Reservation

    Plaintiff is also seeking the current market value of all three homes as restitution for the years of deprivation and denying the Plaintiff the use of said homes, and loss of Plaintiff' personal items and properties to include reimbursement for the electrical bill that remains in Plaintiffs name at (b.) above by Moon Lake Electric, Roosevelt while the state real estate agent keeps Plaintiff locked out, be reimbursed from the date of eviction and lockup to the current date of settlement from the defendants with accumulated interest rates to be applied.

3. <u>Uinta River Valley (*Reserve*) Reservation "ASSETS"</u> Plaintiff is seeking the defendants' to conduct an "Audit" a "Full and Final Accounting" of all 'assets' unlawfully being utilized and or unlawfully taken and removed from said Reservation underlined above, this is to

include the same of the alleged Ute Indian Tribe, its alleged tribal assets, fish and wildlife department incoming revenue from licenses, boating fees', camping fees', its businesses and its corporate enterprises'. The State of Utah, State, county and city corporations, monies generated by unlawful taxation both state and federal, licenses, court fees and fines, court ordered restitution monies, child support order's, any and all monies derived and taken unlawfully, including Utah's Division of Natural Resources from within said Reservation underlined above, every source of 'revenue must be accounted for', including the state formed Ute Distribution Corporation and the state formed corporation sole a 'holding' company, its corporate members, whose office building located downtown Salt Lake City, Utah, must give and accounting for the incomes and revenue derived and used by its members generated from within said underlined Reservation, including 'tithing's' generated all monies or unlawfully being derived from Reservation 'assets' must be fully audited and accounted for by all entities for collecting and receiving of ill-gotten gains any financial revenue from within the Uinta River Valley (*Reserve*) Reservation. As the Plaintiff cannot determine her share or interest being derived by all the above until these 'audits and full final accountings' are conducted and reported back to the Plaintiff by the defendants' starting from the year 1865 when the order to remove White settlers (Mormons) from the said reservation was not enforced by the defendants.

4. That the Mormon corporate headquarters, including the Utah Territorial and today's State Government share equally and are hereby to be held equally liable for the actions of their prophet Brigham Young's extermination order no. 2 to kill the Shoshone Utah Indians within Utah Territory as is evidenced by Brigham Young's Discourse given in the New Tabernacle on April 9, 1871 which is very pertinent and self-explanatory as to the Mormons intentions

under the Utah Territorial government by their Memorial To Congress, Approved January 6, 1862 *[For an Act Authorizing Treaties with Indians, and the Extinguishment of the Indian Title.]* it identifies the Indians they were targeting, quote:

[Your Memorialists, the Governor and Legislative Assembly of the Territory of Utah, respectfully pray your honorable body for the passage of an act to authorize the extinguishment of the Indian title to lands in this Territory, suitable for agricultural purposes and for the necessary appropriation to purchase said land, and **provide an asylum for the Shoshone, Utah, Parvante, San Pitch, Piede, Cummvmbabs, Uinta, an Peobowat Indians, and such other tribes or bands, or portions of tribes, as may be in possession of lands suitable for the advancement white (Mormon) settlements in this Territory.**]

In as much as Utah Mormons acting in their capacities as attorneys', congressmen and senators have played a pivotal and joint role with the defendants' in the planning and executing of P.L. 671 Ute Partition Act, April 5, 1956 and the Termination Proclamation, 26 Fed. Reg. 8042 (August 26, 1961) AR 1432. *Accord* 25 U.S.C. 677v., is nothing short of Utah's Mormons continuation of Brigham Young's extermination order revised as Utah Mormons termination order against the Shoshone Indians of Utah Territory. The Plaintiff is seeking restitution in the amount of one-hundred million dollars or the highest amount allowed under federal law to be divided equally between the Mormon corporate headquarters and the State of Utah Government, said monies are to paid into an account set-up by the United States Government and be held in said account for the rebuilding and restoration of the Shoshone Nation of Utah Indian communities, health facilities and or any other necessities within the 1861 Uinta River Valley (*Reserve*) Reservation with one fourth of said monies to be used for any Shoshone Utah Indians that trace their lineage back to the un-ratified Spanish Fork Treaty as just and equitable compensation, shall be all that is required of them, by proof of lineage.                 *See exhibit 9. 3 pgs.*

5. That the defendants' remove the fraudulent "Ute Indian tribe" of the fraudulent "Uintah and Ouray Reservation and any other Ute alleged federal reservations from the Federal Register.

6. That the U.S. Bureau of Land Management also be included under this 'audit' for a 'full and final accounting" of all revenue generated from unlawful utilization of Uinta River Valley (*Reserve)* Reservation lands and resources.

## CONCLUSION

The defendants, Utah Mormons Corporate Headquarters, under its Mormon membership acting in their official capacities as attorneys', congressmen, senators' and Mormon state citizens, did jointly organize, plan and implement the unlawful usage of the three Colorado 1880 Confederate Whiterivers', Uintah Yampah a band of Whiterivers' and the Uncompahgre State Ute Citizens to overthrow the U.S. Senate Act May 5, 1864 (13 Stat. 63) Shoshone Nation of Utah Indians and take unlawful possession of the 1861 Shoshone Uinta River Valley (*Reserve*) Reservation by unlawfully replacing them with the IRA – Ute Indian Tribe of the Uintah and Ouray Ute Reservation all four entities and their predecessors' knowingly engaged in an active on going attempt to commit an act of genocide against the Shoshone Nation Indians of Utah, thus, the Plaintiff by unlawfully changing Plaintiff's 'race' from a Shoshone Utah Indian, Uinta River Valley (*Reserve*) Reservation, Uinta Agency to that of an unlawfully alleged Mixed blood Uintah "Yampah" a band of Whiteriver 1880 Colorado State Ute Citizen under fraud of the IRA – as the alleged Ute Indian Tribe, Uintah and Ouray Ute Reservation under P.L 671. Ute Partition Act April 5, 1956 and the Termination Proclamation 26 Fed. Reg. 8042 (August 26, 1961) AR 1432. *Accord* 25 U.S.C. 677v.

Plaintiff has been left homeless and is dependent upon the help from one family member for a Roof over my head and a Bed to sleep in since the unlawful foreclosure and resale of my home at 820 East 300 North Roosevelt, when Plaintiff lost all her possessions stolen by a state realtor

18

under fraud of Utah law, what monetary price is considered just and equitable compensation from the defendants' whose actions were motivated just to keep the defendants unlawful activities and planned policies in place in an attempt to avoid defendants legal liabilities.

   Plaintiff herein prays the court will administer a fair and impartial decision and grant the Plaintiff's "Relief being Sought" herein.

Dated this Day September 4, 2024

*Richita Hackford*
Richita Hackford
820 East 300 North 113-10
Roosevelt, UT 84066

Certificate of Mailing

I, certify that on September 4, 2024, I mailed by United States Priority Mail a true and correct copy of Plaintiffs' complaint " Wrongful Termination, Deprivations and Injuries Suffered as a Direct Result of P.L. 671 Ute Partition Act April 5, 1956 and the Termination Proclamation, 26 Fed. Reg. 8042 (August 26, 1961) AR 1432. *Accord* 25 U.S.C. 677v." to the following:

United States District Court
District of Utah
Office of the Clerk
351 South West Temple
Salt Lake City, Utah 84101   (one copy) including one copy of page 1, to be stamped received filed and returned in the stamped self-addressed envelope

Listing of Defendants last known addresses

Mark Lee Greenblat
U.S. Department of the Interior
Office of the Inspector General
1849 C Street NW – Mail Stoop 4428
Washington, D.C.  20240

Deb Haaland
U.S. Secretary of the Interior
1849 C Street NW
Washington, D.C.  20240

Darryl LaConte
Director of the Bureau of Indian Affairs
1849 C Street NW
Washington, D.C.  20240

Tracy Stone-Manning
Director of the Bureau of Land Management
1849 C Street NW
Washington, D.C.  20240

*Richita Hackford* (signature)
Richita Hackford
820 E 300 N 113-10
Roosevelt, Utah 84066